Will the argument next in Lightbox Ventures v. Moldovsky, 18-3721. Mr. R. Miller, my name is Jonathan R. Miller, I'm an attorney for Lightbox Ventures, I'm The focus of this appeal is what I consider to be smoking gun evidence of Mr. Moldovsky's misconduct. Specifically, there were... Could you prove Mr. Moldovsky's misconduct? Could you prove that he was discharged for cause? He wasn't discharged at all, Your Honor. He resigned and the second part of our appeal is that he misrepresented to the court that the Lightbox Ventures had agreed that he would withdraw towards the close of the case. There's no question that he was discharged for cause. He wasn't discharged at all. He resigned. He moved to withdraw. What you could prove, you might be able to prove or at least demonstrate to the court that Mr. Moldovsky was a bad guy, but you couldn't prove that he was discharged for cause. He wasn't discharged at all. However, the law is very clear that an attorney who withdraws without good cause also forfeits his right to an attorney lien. There are two incidents in play here, Your Honor. There's the November 2017 renegotiation of what was a contingency fee contract, $75,000 up front, plus a contingency fee into an hourly fee contract. That negotiation was improper. It was misconduct. It was conducted under improper threats of case of client abandonment. We had tapes and e-mails where Mr. Moldovsky said, and I believe he's going to contend this morning, that he had a contractual right to drop the case in the middle simply because he considered the contingency fee no longer worthwhile to him. Hardly in the middle. Wasn't the case already over except for the judge to make the decision? Not in November 2017. In November 2017, that was the day after, November 14, 2017 was the day after the judge Cote disqualified both of Lightbox Vengers' expert reports and took a case which, at least on paper, was going to be several billion dollars, ratcheted it back down to $100,000. No, but in November 2017, he said, I have a contractual right to stop all work. I have a contractual right to start charging you hourly fees, and both of those are incorrect. He's going to take a different position, but both of those statements are incorrect, and he leveraged those misrepresentations of what the law is and what was actually in the contract. He kept working on the case, and then he applied to Judge Cote to withdraw. The judge approved it. The judge had before the letter from Mr. Elmer saying don't let him out until after you make a decision. The judge agreed to that. He's out. So he was never fired. How does this affect under New York law? How is it that he's not entitled to a lien? He wasn't discharged. He's not entitled to a lien because the law is that attorney misconduct that occurs before the withdrawal but is discovered only afterwards can also forfeit a lien. We've documented and we've presented to the court, like I said, smoking gun evidence of misconduct that occurred in and around November 2017, and then again in March and April of 2018. But it was on this case from the beginning until the end, right? That's correct. What about everything that went on? She didn't see anything that went on behind the scenes. As Mr. Moldovsky himself points out, there were no court appearances by anybody. Everything was by paper. And what occurred, you know, four walls between conversations between Mr. Moldovsky and Lightbox Ventures principal, Mr. Elmer, was not known at all to the courts. Did you complain that you weren't given an opportunity to make your case or is your complaint that Judge Coates didn't calculate the fee award correctly? No, we take no objection to, no disagreement to the calculations. Judge Coates had total familiarity with the case, the scope of the work involved. I call that the quantum in my briefs. We have no dispute with the quantum. That was totally within the judge's discretion and I have no reason to take— The fact of the award. You're disputing the fact of the award. The fact. Yes, basically that Judge Coates did not consider Mr. Moldovsky's misconduct, which forfeits the fee award. In other words, he could have— Didn't she submit a lot of paperwork to Judge Coates? Yes, and she said that— She said that she considered it but that she thought it was irrelevant. She did not mention what she— She said the parties considered many exhibits and it's irrelevant. And with all due respect to Judge Coates, I believe that smoking and evidence of fraud, including tapes, should have been considered, discussed, and if Judge Coates found that Mr. Moldovsky was acting appropriately and demanding an hourly fee agreement in the middle of a case simply because he determined it was not going to be worthwhile to him— You're planning on making a 20-day recount. What fee award did you have? Prior to Mr. Moldovsky, there was the Skorola firm, Your Honor. Skorola, Skorola, Maloney, and Zubatov. In that case, there was a parting of the ways, but that was a different situation, Your Honor. That was over invoices that were not paid. We have a different version of the Mr. Skorola, and that's under— Right, but what's different here is that Mr. Moldovsky came into the case on a contingency probation. Like I said, $75,000 plus contingency, and the law is very clear that the whole point of a contingency fee is that an attorney assumes a risk of a $0 recovery, that he's not going to get paid anything besides, in Mr. Moldovsky's case, the original $75,000, and he acted totally contrary to basic principles of what a contingency fee is. I quote in the briefs that the law is that a risk fee contingency fee, where the attorney can drop the case simply because it's not going to pay out for him, is nothing short of pure greed. How do we review Judge Coates' determination that Mr. Moldovsky's deportment was within the range of professional conduct? Is that subject to clear error, or is that a finding? How do we review it? I'm not sure if that's a finding, Your Honor. I believe it's the subject of— Isn't that important? I think the question is what did Judge Coates mean by deportment. I looked at what deportment is. It's how someone conducts themselves in public. Let's put it this way. One reasonable way of reading that is that he did not violate the rules of professional conduct. Do you agree? No, I wouldn't. I don't think the word deportment means that, and there's no— There's a potential significant disagreement, but if that was a reasonable way to read those words, then how are we to—how do you propose we review that? Is that a finding subject to clear error analysis? Is that something else that's subject to an abuse of discretion? I think it's clearly erroneous that had Judge Coates looked at the transcripts and accepted our proffer of the actual tape recordings, that it would have been outside the range of a permissible range of decision to say that Mr. Moldavsky conducted himself appropriately because he clearly did not. So it's your position that that statement by Judge Coates wasn't a finding? I don't know how to understand Judge Coates' statement as to deportment. She cites to a New York case, a First Department case. I looked at that case. The standard of deportment does not appear to be a factor that's recognized by the New York courts prior to the case. Instead, I would like to point the court respectfully to a case from the Second Circuit, 2016. The title's in French, so I'm going to have to mispronounce it. Agence France-Presse, 645 Federal Appendix 86-87, that says that when determining a charging lien on a quantum error basis, factors to be considered include difficulty of the matter, nature and extent of the services rendered, time reasonably expended on those services, the quality of performance of counsel, the qualifications of counsel, the amount at issue, and the results obtained. If I had to analogize what deportment means, maybe this means the quality of performance, but it does not say anything about considering what occurred behind the scenes between the attorney and the client that the court is unaware of. So you think that that's a wrong, whatever it means, the finding is wrong? Yes, I believe that either we should have at least had an evidentiary hearing and an opportunity to present arguments pro and con. We'll hear from your adversary, Mr. Moldavsky. Thank you. And you reserve some time for rebuttals. All right, yes. Good morning. May it please the Court, on behalf of Bren Moldavsky, LLC, I do want to speak to what was just spoken to, but so I don't miss it. I wanted to apologize. We had a typo in our brief on page 36 indicating Rule 1.16 was 1.6. I'm sure the clerks caught it. The focus is on cause, whether it's discharge or termination, whether the client does it or the attorney, it's cause. The Court found no cause here because there was no cause. The two issues they raised about the amended agreement and withdrawing on false pretenses, the amended agreement, it benefited them under the standards that one looks at. They had counsel. They reviewed it carefully. They gave input, and they got the input. At that point, under the initial agreement with the cause, they also complained about that they fully agreed to. If cause allowed it to revert . . . Would you address Brooks v. Lewin, in which our colleagues in the State Court said, in connection with the case where the lawyer threatened to withdraw its services from plaintiff without good cause and for its own economic benefit, that that was a violation, that it might be a violation of the professional rules of conduct? Absolutely, Your Honor. I think a good way to address that is by pointing to a case from this court, the Holocombi v. Matsuborchik case, which was brought to the judges here. I have the site to it as well, which I can give in a moment. But basically, in that case of 2018, there a court affirmed a trial court blocking a charging lien because of attorney conduct that was like the attorney was saying, I must control the settlement, and if not, I'm getting off. In other words, in cases that you're really taking advantage of somebody, which didn't happen here, and another distinguishing factor is that, in this case, the client was a former global managing director at Lehman. This was a very high-stakes venture, and he had plenty of counsel. He was a boarding grad. In other words, he was a very sophisticated client. And here, as the ethical rules say, if there's going to be a change in an agreement, if you have it in the original agreement, that's appropriate. It was in the original agreement. But what Brooks says is a lawyer may not use threat of withdrawal to coerce a fee increase after the representation has commenced. A wonderful way to distinguish that is, in our instance, there was no threat of withdrawal. The clause simply provided that if it wasn't worthwhile, because he wanted as low of a rate as he could get. So we did that and said, look, we can't be in this if it goes on endlessly. We need a clause that we can just revert to our hourly, and that was agreed on. So when it came to that, after summary judgment and this multimillion-dollar picture became so much more difficult, we raised that, and we're just going to go to our hourly rate. Then the idea was to help the client. We reached an amended agreement that took the normal hourly rate, and they only had to pay one-third of the hourly rate. And the back-end two-thirds went to the back only to be paid by Lightbox, which had very little, and Mr. Elner, who has the real funds, he wasn't responsible. So the amended agreement really benefited him, and we didn't need the amended agreement. We were happy to stay with the regular hourly rate. And also, if there is, in cases where there's some concern about the agreement, like here, it was a quantum error of the ward. So unless there's severe misconduct, like in the case from this court, a charging lien is in flux. There was no threat of withdrawal. So in your brief at 16, you say, against this background, it became clear that withdrawal was necessary and appropriate. Pursuant to the agreement, you had a right to withdraw from representation, and you told your client that you were going to withdraw. It happened two different times, not based on you better change to a new agreement or I'm going to withdraw, but just simply based on if you're not paying the hourly rates agreed upon under the agreement or the amended agreement, and that's what happened in the amended agreement. He stopped paying, and he says it was a wrongful withdrawal because we said it was about communication and strategy problems and payment, and he says we made up the strategy and communication problems, and Judge Coates did an abuser's discretion, a point I wanted to get to. It's clearly an abuser's discretion standard in that case I cited as well. It's an abuser's discretion standard throughout, even on the evidentiary issues. The withdrawal then, when it eventually happened, it was after all the work was done, and initially it was raised after summary judgment that we said it's not worthwhile, we just want to go to our hourly rate. And for the client, the client wanted the amendment. There's no negative impact from the withdrawal at all. The court looked at this closely, this idea. First, Mr. Elner and the court knew him. He appeared in person. There was a personal appearance. There was a whole preliminary injunction hearing. I didn't appear, but they showed hundreds of pages, numerous affidavits. She looked at everything. She saw no misconduct because there was none. And there's no basis. We spent 1,700 hours on this. We had a number of people working on this. We did nothing wrong. To forfeit all of our fee as they're seeking is totally inappropriate, and Judge Coates saw that. They pretty much make a caricature of things. We were dedicated, loyal work nights, weekends, nonstop, gave everything to them, and they make up this caricature where are saying, well, we want to revert to our hourly rate now under the agreement we agreed to. That becomes fraud and duress. None of that's true. It's a caricature, and Judge Coates clearly saw that. She knew the party. She saw Mr. Elner testify. She knew who he was dealing with. A perfect example is they painted themselves as a neophyte, like someone to be taken advantage of. Judge Coates didn't abuse her discretion in realizing that Lightbox, who proclaimed to her that they could do legal operations throughout the planet and Mr. Elner, who's hyper-sophisticated, wealthy, that they weren't the neophytes they say they were. The law that they point to is injury law where it's a very different setup than with a high-level, sophisticated financer. And also I'll point out that the standard they admit in their brief, there was no argument. They say clearly it's an abuse of discretion standard. Before the amended agreement, was there not evidence of a threat to Lightbox? Before the amended agreement? Before the amended agreement, what would have happened at about the time of after summary judgment when we raised, look, we have to revert to our hourly rate. We just can't do this. We'll get crushed. We already put 1,000 hours in. There would have been a discussion. We would have said in just the case. There was a discussion. And we discussed that, look, we revert to the hourly rate. We go on the hourly rate. And if you're just not going to pay, then we'll have no choice but to do a motion to withdraw because we just can't afford it. And that was what was agreed on. And, you know, I'm not speaking to the various things that were already ordered as not authorized here, unless the court, of course, asks about it. They raised the issue that they didn't get a hearing. You only get a hearing if it's triggered because of cause. If there's an issue of fact, sort of like a summary judgment standard, she saw there was no issue of fact. It wasn't even close. And accordingly, there was no basis in need for a hearing. And generally, if the allegations are boilerplate, laundry list, and they may, by the way, the other law firm, they attacked the other law firm, too. They didn't say that here, but they attacked the other law firm in almost identical type of attacks as me. And when Judge Coates saw they did it to both firms, that must also impact her decision. And both firms, with a lot of work, showed how it was totally made up and undermined everything. And when all you can present are – The amount that we're talking about is roughly $46,000? About $46,000. $45,000, $46,000 was the charging lien amount. And, again, we put a tremendous amount of work in. And there's even laws that we've shown where you only, again, lose your fee if there's a major issue, not for the type of issues that they described. Again, that Hall-Combie v. Matsuborchik case, again, the conduct there, she had statements like, I will determine whether a settlement is reasonable. If you disagree, I will immediately cease representing you. Nothing like that happened here. I will point out, and also, again, another one of their major points is that, well, when we did the amended agreement, even though we were giving – they had a number of counsel around. There were three law firms on the case. Mr. Miller took over and asked me, so three law firms. That – yeah, that even in doing that, we showed that our conduct was appropriate and that we had done nothing wrong and that this was a highly sophisticated client, and the client got the benefit of the bargain. And, accordingly, there's no reason to take away our fee, and Judge Cote should be affirmed. I will rest unless the Court has further questions. So in Holcomb, on which both Judge Parker and I were members of the panel, we did acknowledge that improper threats of withdrawal can constitute a form of professional misconduct, correct? If there's any improper threats here, there were no improper threats. And I think it would also have to be pretty extreme, pretty strong, and look who the client was. In that case, it was someone who was much more tender. Here, it's someone who's highly sophisticated, but there were no improper threats. Thank you very much. Mr. Miller. Mr. Moldovsky and I disagree on the facts and the fact – the simple fact that Mr. Moldovsky appears today and dispenses an entirely different set of facts than what is in the record. You're asking me? Mr. Moldovsky or me? I'm sorry, Your Honor. You're at the podium, Mr. Miller. Did I sign a – did I say – did I sign a retainer agreement that calls for a withdrawal? No, I'm being paid hourly. That's correct. Pardon me? Myself, I'm being paid hourly. I'm being paid a discounted hourly rate, but my fee agreement I don't believe is part of this appeal. As I started to say, the fact that Mr. Moldovsky is able to spin an entirely different set of facts points to the – one of the key concerns here is that Judge Cote did not review the documents, did not enter findings of – factual findings, and we're here on appeal debating on what the basic facts are. With respect to Mr. Moldovsky's argument that he had a contractual right to revert to hourly rates, it's simply untrue. The agreement is independent. It speaks very clearly. At the time that Mr. Moldovsky was retained, it was an expectation, virtually a certainty, that the Scarola firm would wind up suing Lightbox Ventures, and there was an anticipation of work. And, in fact, Mr. Moldovsky's firm and people associated with his firm did do work on the state court case, which I subsequently got involved with. So to the extent that there's any allowance for hourly fees, it spoke to litigation in other jurisdictions, appeals, litigation, like I said, now in the state court. There was a modified contingency arrangement with Mr. Moldovsky, is that right? That's correct. Was that superseded? That was replaced in November, December 2017 with an amended agreement under conditions, like I said, of attorney misconduct and duress. Was there a contingency fee arrangement under that? Did it call for hourly rates? The second fee agreement? The second fee agreement called for hourly rates, partly deferred, plus also a contingency fee. And so with respect to the threats to withdraw, the Holcomb v. Monty Borchek case speaks to that, and your honors were on the panel, so you're more familiar. We qualified that. We said improper threats. Improper threats. There are proper threats to withdrawal. There's proper threats to move to withdrawal. However, the fact that an attorney now believes that the contingency fee data you originally contracted for is no longer going to pan out well for him is not permissible grounds to withdraw from the case. That is sort of a factual finding that Judge Cote disagreed with, with the motivation component. That wasn't presented to Judge Cote. Judge Cote was presented with a one-page letter by Mr. Moldovsky where Mr. Moldovsky falsely stated that Lightbox agreed to his withdrawal. Judge Cote entered the decision granting the motion to withdraw before seeing a single piece of paper from Lightbox or hearing any of the parties, and it was based entirely on Mr. Moldovsky's false representation that Lightbox had agreed to his withdrawal. Then you presented documents to Judge Cote in which you disputed Mr. Moldovsky's letter, and she says, I read this and I found it irrelevant. It's not clear what—the parties submitted hundreds of pages of documents and information. It's not clear what— You didn't read them? You said you read them. I don't want to go that far, but the fact is that all three parties— It's a conclusion you didn't like. Your Honor, all three parties simultaneously submitted hundreds of pages of documents. On October 12, 10 days later, Judge Cote issued the decision. I don't know which documents, because she doesn't say. I'm not going to guess which documents she considered and which documents she considered irrelevant. I just don't know, and our position is that based on the actual documents, based on the transcript and based on our proffer of the tape recording, that this should have at least entitled us to an evidentiary hearing, and I view this as smoking gun evidence of misconduct. Mr. Moldavsky claims inaccurately that he had a contractual right to revert to hourly fees. It's just not true. It's contrary to the rules of professional conduct. Specifically, I note in the brief that Rule 1.116C of New York's Rules of Professional Conduct lists a laundry list of reasons that an attorney can withdraw or threaten to withdraw, and those would all be proper threats, but it has nothing to do with the worthwhileness of a contingency fee. There's case law, and it's in the brief that says that no, an attorney cannot withdraw simply because the case is not going to no longer look like a worthwhile case to him. In fact, based on the prior colloquy, to find that Judge Cote clearly erred as a factual matter, that this was not consistent with the rules of professional conduct based on the conduct that occurred here. Yes.